Filed 10/3/24  P. v. Gomez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOVANI MANUEL GOMEZ,<br><br>    Defendant and Appellant. | B329300<br><br>(Los Angeles County<br>Super. Ct. No. PA070040) |

APPEAL from an order of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge.  Affirmed.

Jason Szydlik, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Michael C. Keller and Blake Armstrong, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Jovani Manuel Gomez was convicted in 2011 of murder and other crimes.  He appeals from the superior court's order following an evidentiary hearing denying his petition for resentencing under Penal Code section 1172.6.[1]  In this, his second, appeal from an order denying his section 1172.6 petition, Gomez argues the superior court failed to consider his relative youth—he was 23 years old at the time of the murder—among the totality of the circumstances relevant to determining whether he had the requisite mental state for second degree murder.  We conclude there is no reasonable likelihood that, had the superior court considered Gomez's age when he committed the murder, the court would have granted Gomez's petition.  Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *A Jury Convicts Gomez of First Degree Murder,*
      *We Reverse That Conviction, and the People Agree To*
      *Reduce the Conviction to Second Degree Murder*

Our opinion reversing the superior court's order summarily denying Gomez's section 1172.6 petition summarized the evidence at trial.  (See *People v. Gomez* (May 20, 2021, B303647) [nonpub. opn.] (*Gomez II*).)  "Gomez, Kevin Alvarenga, Juan Carlos Andrade and Leonardo Garcia were charged in an information with murder (§ 187, subd. (a)) (count 1), attempted premeditated murder (§§ 187, subd. (a), 664) (count 2), two counts of shooting at an inhabited dwelling (§ 246) (counts 3 and 4),

---

[1]    Statutory references are to the Penal Code.

2

discharge of a firearm with gross negligence (§ 246.3, subd. (a)) (count 7) and street terrorism (§ 186.22, subd. (a)) (count 8). Gomez and Garcia were also charged with one count each of being a felon in possession of a firearm (former § 12021, subd. (a)(1)) (counts 5 and 6).  It was specially alleged as to counts 1 through 7 that the offenses had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and as to counts 1 through 4 that each of the defendants had personally used and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)) and/or a principal had personally used and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (e)(1)).” (*Gomez II*, *supra*, B303647.)

“German Chairez and Leonel Serrano were members of Columbus Street, a criminal street gang.  Gomez, Alvarenga, Andrade, and Garcia were members of a rival gang, Vincent Town.  On November 19, 2010 Chairez and Serrano were visiting a friend at an apartment complex.  As they walked downstairs to leave the complex, Serrano heard someone shout ‘Fuck Columbus!’ and saw two men shooting at him and Chairez. Serrano and Chairez turned around and raced back up the stairs as the assailants continued shooting.  Both men were hit in the back.  Chairez died from a bullet that perforated his lung. Serrano survived.”  (*Gomez II*, *supra*, B303647.)

“Salvador Ortiz was in the area of the apartment complex on the night of the shooting and encountered Andrade, Garcia and Gomez, known to him by their gang monikers, ‘Happy,’ ‘Baby’ and ‘Clever,’ respectively.  Ortiz noticed Andrade and Garcia were armed.  One man had a semiautomatic weapon; the other a revolver.  Their conversation was friendly because Ortiz,

a member of the Barrio Van Nuys gang, was not a rival. Within a few minutes of talking to them, Ortiz heard a person in the alley shout that a 'Columbus Streeter' was nearby. Andrade, Garcia and Gomez ran toward the apartment complex. Ortiz saw Garcia quickly pull out a gun from underneath his sweatshirt. Almost immediately, Ortiz heard a barrage of gunshots fired from two different guns. He did not see the actual shooting." (*Gomez II*, *supra*, B303647.)

"At trial Serrano denied seeing the shooters. Testifying after Serrano, Maria Gutierrez (Chairez's girlfriend and the mother of his child) explained she had overheard Serrano tell a friend that Clever and Big Boy, referring to Gomez and Garcia, had been the shooters and Happy and Kevin, referring to Andrade and Alvarenga, 'had [also] been there.' Brandon Binning testified that two days before the shooting Andrade had told him something 'was going to go down' and 'Columbus Street was going to see that Vincent Town was back.'" (*Gomez II*, *supra*, B303647.)

The People argued each of the defendants was either a direct perpetrator of the crimes charged or aided and abetted those crimes. In addition to instructions on murder and first degree premeditated murder, the court instructed the jury on direct aiding and abetting and the natural and probable consequences doctrine. The trial court instructed the jurors that, under the natural and probable consequences doctrine, they could find any one of the defendants guilty of murder or attempted murder if he aided and abetted the target offense of shooting at an inhabited dwelling or the uncharged target offense of assault with a firearm and the natural and probable consequence of

either target offense was murder or attempted murder. (*Gomez II*, *supra*, B303647.)

The jury convicted Gomez and his codefendants of first degree premeditated murder and all other charged offenses and found each of the special allegations true. The trial court sentenced Gomez to an aggregate term of 162 years to life. (*Gomez II*, *supra*, B303647.)

On appeal we reversed Gomez's and his codefendants' convictions for first degree murder because in *People v. Chiu* (2015) 59 Cal.4th 155, decided after Gomez's trial, the Supreme Court held aiders and abettors may be convicted of first degree premeditated murder under direct aiding and abetting principles, but not under the natural and probable consequences doctrine. (*People v. Gomez* (June 23, 2015, B251303) [nonpub. opn.] (*Gomez I*); see *Chiu*, at pp. 158-159.) We also reversed the convictions for discharging a firearm with gross negligence as a lesser included offense of the charge of shooting at an inhabited dwelling. Following remand, the People elected not to retry the first degree murder charge and agreed the court could reduce that conviction to second degree murder. (*Gomez II*, *supra*, B303647.) The superior court resentenced Gomez to an aggregate term of 120 years to life.

B. *The Superior Court Twice Denies Gomez's Petition for Resentencing Under Section 1172.6*

In 2019 Gomez filed a petition for resentencing under former section 1170.95 (now section 1172.6). The superior court summarily denied the petition based on the jury's finding Gomez had personally used and discharged a firearm causing great bodily injury or death. The court ruled this finding made clear

Gomez "was the actual killer or at a minimum aided and abetted the killing and/or was a major participant in the crime and acted with reckless indifference of the victim's life." Gomez appealed, and we reversed. We held the superior court erred in summarily denying Gomez's petition because "the jury may have convicted Gomez of murder and found true the section 12022.53, subdivision (d), firearm-use enhancement based on his participation in the target crime of shooting at an inhabited dwelling and its conclusion Chairez's death was the natural and probable consequence of that act." (*Gomez II*, *supra*, B303647.) We directed the superior court to appoint counsel for Gomez, issue an order to show cause, and conduct an evidentiary hearing under section 1172.6. (*Ibid*.)

At the evidentiary hearing in January 2023 Gomez presented testimony from three alibi witnesses. The superior court ruled that, even if the witnesses' testimony was admissible in a hearing under section 1172.6, it did not establish an alibi for Gomez or change the court's decision to deny Gomez's petition. The court stated: "Pulling the trigger of a loaded gun and firing multiple shots at two people in the back as they fled clearly demonstrate express malice, and/or aiding and abetting based on express or implied malice, at a minimum. Even if Gomez did not expressly intend to kill, which this Court believes is not debatable, his actions clearly and unequivocally demonstrate that he personally acted with implied malice and/or aided and abetted the perpetrator with implied malice, because by his words or conduct, Gomez aided the commission of the life-endangering *act*, not the result of that act." Gomez timely appealed.

## DISCUSSION

A.      *Section 1172.6*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Curiel* (2023) 15 Cal.5th 433, 448; *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843), and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957).  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e).

Section 1172.6 authorizes an individual convicted of murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts, if he or she could not now be convicted of murder because of the changes the Legislature made effective 2019 to the definition of the crime.  (See *People v. Curiel, supra*, 15 Cal.5th at pp. 449-450; *People v. Strong, supra*, 13 Cal.5th at p. 708; *People v. Lewis, supra*, 11 Cal.5th at p. 957.) If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner, if requested.  (*Lewis*, at pp. 962-963; see § 1172.6, subd. (b)(1)(A), (3).)  The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to

7

determine whether the petitioner has made a prima facie showing he or she is entitled to relief. (§ 1172.6, subd. (c).)

Where, as here, the petitioner has made a prima facie showing he or she is entitled to relief under section 1172.6, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).) At that hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).) The petitioner and the prosecutor may also offer new or additional evidence. (*Ibid*.; see *People v. Gentile, supra*, 10 Cal.5th at pp. 853-854.)

> B. *Any Error in Failing To Consider Gomez's Youth Was Harmless*

Gomez does not argue substantial evidence did not support the superior court's findings. Gomez argues only that the court erred in failing to consider his youth (as stated, he was 23 years old when he committed the crimes) in determining whether he acted with the requisite mental state for second degree murder. Any error, however, was harmless under the applicable prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1007 [*Watson* standard, "which asks whether it is reasonably probable that a result more favorable to [the defendant] would have been reached absent the failure to consider his youth," applies to the superior court's failure to consider the defendant's age in ruling on a section 1172.6 petition]; *People v. Pittman* (2023) 96 Cal.App.5th 400, 417-418 (*Pittman*) [*Watson* harmless error standard applies to the superior court's failure, in ruling on a section 1172.6

8

petition, to consider the defendant's age in determining whether he acted with implied malice]; *People v. Oliver* (2023) 90 Cal.App.5th 466, 489 & fn. 8 (*Oliver*) [same].)

### 1. *Applicable Law*

The superior court found Gomez could still be found guilty of second degree murder as either the actual killer or an aider and abettor.  We focus on aiding and abetting liability because the evidence did not specifically show whether the bullets Gomez fired actually killed Chairez.  And while we agree with the superior court there was circumstantial evidence of express malice, we focus on implied malice because that is the theory where the defendant's youth is particularly relevant in determining whether he or she had the requisite mental state for second degree murder.  (See *Pittman*, *supra*, 96 Cal.App.5th at p. 417 [defendant's youth is relevant to the determination whether the defendant acted with conscious disregard for human life]; see also *People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 1005 ["California cases only recently began to require consideration of a young adult offender's age in resentencing petitions involving implied malice murder convictions."].)

Second degree murder is """the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder."""" (*Pittman*, *supra*, 96 Cal.App.5th at p. 414; see *People v. Cravens* (2012) 53 Cal.4th 500, 507.)  "Malice aforethought may be express or implied.  [Citation.]  Implied malice exists when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

9

[Citation.] Murder is committed with implied malice when the killing is proximately caused by an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citation.] To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical. [Citation.] The question of implied malice is to be decided in light of all the circumstances." (*Pittman*, at pp. 414-415, internal quotations omitted; see *People v. Reyes*, *supra*, 14 Cal.5th at p. 988; § 188, subd. (a).)

"""[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. . . . The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life."" (*Pittman*, *supra*, 96 Cal.App.5th at p. 415; see *People v. Reyes*, *supra*, 14 Cal.5th at pp. 990-991.) "The direct aider and abettor must, therefore, act with intent to aid the life-endangering act of the direct perpetrator that proximately causes the death." (*Pittman*, at p. 415.) Thus, for Gomez to be guilty of second degree implied malice murder as an aider and abettor, there must be substantial evidence to support the

10

superior court's findings Gomez knew his accomplice intended to shoot Chairez, intended to aid his confederate in shooting Chairez, knew shooting at Chairez was dangerous to Chairez's life, and acted in conscious disregard of Chairez's life. (See *ibid*.; see also *People v. Montanez* (2023) 91 Cal.App.5th 245, 270 [reviewing the superior court's factual findings for substantial evidence].)

As discussed, Gomez argues the superior court failed to consider his youth in determining whether Gomez acted in conscious disregard of Chairez's life. The court in *Pittman*, *supra*, 96 Cal.App.5th 400 held youth is relevant to "a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability," in determining whether a defendant acted with implied malice. (*Id.* at p. 417.) *Pittman* extended the holdings of earlier cases concluding youth was relevant to determining whether a defendant had the requisite mental state to be convicted of felony murder. (See, e.g., *People v. Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987; *In re Moore* (2021) 68 Cal.App.5th 434, 451.) "The cases discussing the role of youth in relation to criminal culpability 'stress two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.'" (*Pittman*, at p. 418; see *Oliver*, *supra*, 90 Cal.App.5th at p. 489.) "Transient rashness, impetuosity, and failure to appreciate risks and consequences are hallmarks of an immature brain" and may be considered in the totality of circumstances relevant to a defendant's mental state. (*Pittman*, at p. 418, internal quotations omitted; see *Oliver*, at p. 490.)

11

### 2. *There Was No Evidence Suggesting Gomez Acted Impulsively or Under Peer Pressure*

The evidence that two days before the shooting one of Gomez's codefendants said "something 'was going to go down' and 'Columbus Street was going to see that Vincent Town was back'" (*Gomez II*, *supra*, B303647) showed the attack against members of the Columbus Street gang was planned and not the result of "'transient rashness.'"[2] (*Pittman*, *supra*, 96 Cal.App.5th at p. 418.) In addition, at least two of Gomez's codefendants were armed before they saw the victims, and someone yelled "Fuck Columbus!" before opening fire, announcing their plan to attack. (*Gomez II*, *supra*, B303647.) In contrast, in *Pittman* the court held a 21-year-old's youth may have diminished his culpability for second degree murder because the attack occurred by "happenstance" and the defendant armed himself "spontaneous[ly]" with a chisel. (*Ibid*.; see *People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 1008 [evidence suggested the 19-year-old defendant was "'swept up in circumstances' beyond his control," where the defendant's new girlfriend shot her ex-boyfriend with the defendant's gun].) The evidence did not show whether Gomez brought a gun to the apartment complex or used a codefendant's gun, but Gomez and his codefendants ran to the apartment complex as soon as they heard a member of the Columbus Street gang was nearby. (*Gomez II*, *supra*, B303647.)

---

[2] Gomez attempts to discredit this testimony by arguing it "crossed the line into speculation." It did not. The statement was specific in its details and by Andrade, who was present at the shooting. (See *People v. Jones* (2017) 3 Cal.5th 583, 610 [testimony is not speculative "merely because inferences were required" to understand its meaning].)

12

While the crime could be called opportunistic, Gomez and his accomplices did not act "impulsively" or with "'impetuosity.'" (*Pittman*, at p. 418; see *Oliver*, *supra*, 90 Cal.App.5th at p. 490.)

There also was no evidence peer pressure affected Gomez's decision to participate in the shooting.  Gomez argues the ages of his codefendants (25, 25, and 17 years old at the time of the murder), along with his gang membership, created an inference Gomez "experienced peer pressure."  Any such inference, however, would be speculative.  (See *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [inference the defendant played a substantial role in planning the crime based on his age and the ages of his accomplices was "merely speculative"]; see also *People v. Watkins* (2012) 55 Cal.4th 999, 1023 ["'"[a]n inference is not reasonable if it is based only on speculation"'"]; *People v. Holt* (1997) 15 Cal.4th 619, 669 [same].)  There is little indication that Gomez "could not have declined to participate in the murder" (*Oliver*, *supra*, 90 Cal.App.5th at p. 489) or that he was trying to impress an accomplice.  In contrast, in *People v. Ramirez*, *supra*, 71 Cal.App.5th 970 the defendant told police he was afraid that, if he did not help his accomplice, "the neighborhood would find out and someone might kill him later."  (*Id*. at p. 991.)  And in *People v. Jimenez*, *supra*, 103 Cal.App.5th 1007 the defendant "had only recently begun dating [the actual killer] and could have been particularly susceptible to the influence of a new girlfriend."  (*Ibid*.)[3]

---

[3] The court in *Pittman* stated the 21-year-old defendant "participated in [an] attack . . . with two peers who were 16 and 17 years old.  Inferences of immaturity and peer pressure may be drawn from those facts."  (*Pittman*, *supra*, 96 Cal.App.5th at

13

There also was no evidence Gomez's relative youth affected his ability to appreciate the risks and consequences of his behavior. Even a much younger person can appreciate the risks inherent in shooting someone in the back (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595),[4] and Gomez admitted he had two prior felony convictions for which he served prison terms, so that he understood the consequences of committing crimes. Gomez argues his "careless[ness]" shows he did not appreciate the likelihood he would be caught or the consequences of the shooting. He points in particular to his and his codefendants' conversation with Ortiz before the shooting as evidence that Gomez "knew Ortiz would witness the shooting" and "did not care." Gomez again draws an unreasonable inference from the evidence, which showed Ortiz was a friendly member of another gang. In any event such speculation is a far cry from the type of evidence that would support an inference a youthful offender may not have appreciated the risks and consequences of his or her acts. (Cf. *People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 1007

---

p. 418.) The court appeared to have inferred the defendant acted like a teenager because he helped his teenage accomplices spontaneously attack and kill a man. Because Gomez's accomplices were both older and younger, there is no basis for drawing a similar inference in this case.

[4]	The court in *People v. Mitchell*, *supra*, 81 Cal.App.5th 575 stated, in holding an 18-year-old showed a reckless indifference to human life for purposes of determining his culpability for felony murder: "Youth can distort risk calculations. Yet every 18 year old understands bullet wounds require attention. The fact of youth cannot overwhelm all other factors." (*Id.* at p. 595; see also *People v. Reyes*, *supra*, 14 Cal.5th at p. 992 [shooting at someone is a life-endangering act].)

14

[19-year-old defendant was "still on the lower end of the young adult age range," "could have been particularly susceptible to the influence of a new girlfriend," and did not know she had a propensity for violence when she shot her ex-boyfriend with the defendant's gun]; *Pittman*, *supra*, 96 Cal.App.5th at pp. 404-405 [21-year-old defendant suggested he and his friends attack a man in a truck parked in front of the defendant's house and spontaneously took several chisels from a bucket on a neighbor's porch, one of which the actual killer used to stab and kill the victim].) Here, "we are not . . . presented with a situation where a youthful offender was swept up in circumstances beyond his or her control that led to an unintended death." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489; see *ibid.* [23-year-old defendant knew his codefendant planned to kill the victim following a drug deal and agreed to go along to complete the deal]; *In re Harper* (2022) 76 Cal.App.5th 450, 472 [17-year-old defendant willingly participated in a robbery and provided a gun to the actual killer, despite "knowing there was a very high risk—if not a certainty—the victim would die"].) Indeed, Gomez and his codefendants planned to attack members of the Columbus Street gang and armed themselves, and Gomez shot at the victims as they tried to escape.

Finally, Gomez was 23 years old at the time of the murder, which is on the older end of the youthful offender spectrum. (See § 3051 [requiring youth offender parole hearings for offenders who committed their crimes when they were 25 years of age or younger]; § 4801, subd. (c) [parole board must "give great weight to the diminished culpability of youth as compared to adults" for prisoners who committed their offenses at 25 years of age or younger].) "Presumably, the presumption of immaturity weakens

15

as a defendant approaches 26." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489; see *ibid.* [superior court's failure to consider the youthfulness of a 23-year-old offender in ruling on his petition under section 1172.6 was harmless]; see also *People v. Jimenez*, *supra*, 103 Cal.App.5th at p. 107 ["[p]resumably, the younger the defendant, the less mature he is"].) Under these circumstances it is not reasonably probable the superior court would have granted Gomez's petition had the court considered Gomez was 23 years old at the time of the murder. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Oliver*, *supra*, 90 Cal.App.5th at p. 489, fn. 8.)

## DISPOSITION

The superior court's order denying Gomez's petition under section 1172.6 is affirmed.


SEGAL, J.

We concur:



MARTINEZ, P. J.



FEUER, J.

16